UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JEFFREY LEVY,                              :
                                           :
                    Plaintiff,             :
                                           :          DECISION AND ORDER
     -against-                             :          10-CV-5295 (WFK) (JMA)
                                           :
THE CITY OF NEW YORK, et al.,              :
                                           :
                    Defendants.            :
--------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge**

   Jeffrey Levy ("Plaintiff") commenced this action against the City of New York, Police

Officers Sugey Castillo and Eric Travieso, and Police Sergeant Thomas Reed ("Defendants"),

which arises from an incident where Plaintiff was arrested for criminal possession of a weapon in

the fourth degree in alleged violation of N.Y. Penal Law § 265.01(2). Plaintiff seeks recovery

under 42 U.S.C. § 1983 for false arrest, false imprisonment, excessive force,[1] malicious

prosecution, abuse of process, failure to intervene, supervisory liability, municipal liability, and

denial of equal protection. Plaintiff also asserts pendent claims under New York law.

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure on two grounds: (1) Defendants had probable cause to arrest Plaintiff; and (2)

Plaintiff has not shown Defendants initiated criminal proceedings against Plaintiff due to a

harmful intent or collateral objective. For the reasons stated below, Defendants' motion is

granted in part and denied in part.

---

[1] Although not explicitly pled in the amended complaint, the Court reads Plaintiff's allegations as a whole to assert a
claim for excessive force against Officer Travieso. Am. Compl. at ¶¶ 2, 79–84.

## I.  Factual Background

### A.  Plaintiff's Arrest

On April 3, 2010, Plaintiff and his wife, Anne Levy, traveled to Prospect Park to have a picnic together.  Pl.'s Rule 56.1 Statement ("Pl.'s 56.1 St.") at ¶ 29.  Plaintiff brought a picnic bag filled with turkey sandwiches, soda, water, a block of Swiss cheese, and a paring knife.  *Id.* Shortly after 1:00 pm, Plaintiff and his wife set up their picnic blanket on a small hill.  *Id.* at ¶ 30.  The Levys laid down on the blanket and began to read.  *Id.*

After a few minutes, a small child playing nearby kicked or threw a rubber ball into Ms. Levy's face, causing her to yell out in pain.  *Id.* at ¶ 31; Defs.' Rule 56.1 Statement ("Defs.' 56.1 St.") at ¶ 31.  Not seeing anyone nearby who might have been the child's parents, Ms. Levy said to the child, in sum and substance, "That hurt, you can't kick a ball into people's faces" and "It's dangerous."  Pl.'s 56.1 St. at ¶ 32.  Immediately after Ms. Levy spoke to the child, a woman sitting on a blanket about twelve feet from the Levy's blanket (the "Woman") stood up and yelled at Ms. Levy, tell her not to speak to her child and that only the Woman was allowed to discipline her child.  *Id.* at ¶ 33.

Ms. Levy explained to the Woman that the child had kicked a ball into her face.  *Id.* at ¶ 34.  The Woman became upset and continued to scream, using insults and profanity.  *Id.* at ¶ 35. Plaintiff told the Woman that his wife had every reason to speak to the child because the Woman had not disciplined him herself.  *Id.* at ¶ 36.  The Woman walked toward the Levys' blanket and stood on its edge as she continued to yell at them, stating, among other things:  "Slavery days are over and you don't get to talk to me like that"; "You need to shut up you bisexual faggot, with your earring and your skinny-ass motherfucking white bitch."  *Id.* at ¶¶ 37–38.

Plaintiff called 911, described the situation to the operator, and asked for police intervention. *Id.* at ¶ 39. After Plaintiff hung up the phone, a person believed to be the Woman's partner (the "Man") sprinted over toward the Levys' blanket and joined the Woman in screaming at the Levys. *Id.* at ¶ 40. While standing a few inches from Ms. Levy, the Woman yelled, in substance, that she would slap Ms. Levy, "fuck [her] up," and "kick [her] ass." *Id.* at ¶ 41. The Man simultaneously yelled that Ms. Levy was a "motherfucking white bitch." *Id.*

Fearing for his wife's safety, Plaintiff stood up, reached into the picnic bag, and picked up the paring knife in his right hand. *Id* at ¶ 42. The knife was a small kitchen knife with a plastic handle and a blade no longer than two inches. Defs.' 56.1 St. at ¶¶ 5–6. Plaintiff pushed his wife away from the Man and Woman, and yelled, "Get away from her. If you touch my wife, you're going to get hurt." Pl.'s 56.1 St. at ¶ 44. At all times during the incident, Plaintiff held the paring knife in his right hand, down by his side, with the blade facing downward. *Id.* at ¶ 44.

The altercation ultimately ended, and the Man and Woman walked back toward their blanket. *Id.* at ¶ 46. Plaintiff placed the knife into his front pocket. *Id.* Plaintiff then noticed and flagged down a Parks Department truck that was approaching the area. *Id.* at ¶ 47. Plaintiff informed the Parks Department employees that the Woman and Man had attempted to assault Ms. Levy and that they should call the police. *Id.* at ¶ 48. After speaking to the Parks Department employees, Plaintiff again called 911, told the operator of the attempted assault, and requested police intervention. *Id.* at ¶ 49.

After speaking with a 911 operator for the second time, Plaintiff observed three marked police cars approaching the scene and waved to them. *Id.* at ¶ 50. When Officers Castillo and Travieso exited their vehicle, Plaintiff approached them and told them he had a knife in his pocket and that he wanted to give it to them. *Id.* at ¶ 51. Plaintiff removed the knife from his

3

pocket, holding the handle with the blade pointed toward his own body. *Id.* at ¶ 52. After Officer Travieso ordered Plaintiff to drop the knife, Plaintiff immediately complied. *Id.*

Plaintiff then explained to Officer Castillo that the Woman and Man had repeatedly threatened to harm both him and his wife and that Plaintiff had acted only to prevent his wife from being harmed. *Id.* at ¶ 54; Pl.'s Dep. Tr. at 122:17–123:1. Plaintiff did not pay attention to whether Officer Castillo spoke with either the Man or the Woman. Pl.'s Dep. Tr. at 126:9–11. Plaintiff also did not see either Officer Travieso or Sergeant Reed speak to the Man or the Woman. *Id.* at 126:12–17. However, Plaintiff admits that as he spoke with Officer Castillo, he had his back to Officer Travieso and therefore did not know where Officer Travieso was during that time. *Id.* at 122:14–123:5.

While Officer Castillo was interviewing Plaintiff, Officer Travieso interviewed the Man about the incident, who mentioned that Plaintiff had pulled out a knife. Travieso Dep. Tr. at 44:2–45:24. Neither Officer Castillo nor Sergeant Reed interviewed the Man or the Woman. Pl.'s 56.1 St. at ¶ 54. Defendants dispute this fact, asserting that both Sergeant Reed and Officer Castillo also interviewed the Man and the Woman prior to arresting Plaintiff. Sergeant Reed claims the Man and the Woman told Reed that during the dispute, Plaintiff pulled out the knife, causing the Man and Woman to back away. Reed Dep. Tr. at 34:13–25. Officer Castillo claims that after speaking to Plaintiff, Officer Castillo interviewed the Man, who told her that during the incident, Plaintiff was very angry and grabbed a knife, causing the Man to fear for his safety. Castillo Dep. Tr. at 29:6–30: 11. Officer Castillo also claims she interviewed an unnamed witness at the scene, who said she saw a child playing, an argument between the parties, and Plaintiff grabbing a knife. *Id.* at 30:18–31:2.

After Officer Castillo finished interviewing Plaintiff, she conferred with Officer Travieso and Sergeant Reed, and Sergeant Reed ordered the officers to arrest Plaintiff. Pl.'s 56.1 St. at ¶ 55. Officer Travieso then approached Plaintiff, told him he was being arrested for assault and harassment, and rear-cuffed him. Pl.'s 56.1 St. at ¶ 57; Defs.' 56.1 St. at ¶ 57. Plaintiff immediately complained to Officer Travieso that the handcuffs were too tight. Pl.'s Dep. Tr. at 128:19–129:21. After Plaintiff was handcuffed, Officer Castillo led Plaintiff to the police van. *Id.* at 129:12–13. At that time, Plaintiff also told Officer Castillo that the handcuffs were too tight, but she did nothing in response. *Id.* at 129:14–21. As a result of the tight handcuffs, one of Plaintiff's wrists suffered a "very deep gouge" that took about one month to heal. *Id.* at 151:8–152:7. The tightness of the handcuffs also aggravated underlying issues that Plaintiff had with his wrist. *Id.*

Once inside the police van, Officers Castillo and Travieso told Plaintiff he was being taken to the precinct to be given a desk appearance ticket. Pl.'s 56.1 St. at ¶ 60. En route to the police station, Officer Castillo remarked upon Plaintiff's behavior, stating that because Plaintiff was a school teacher, she held him to a "higher standard." Pl.'s Dep. Tr. at 145:7–12; Castillo Dep. Tr. at 47:14–23. Officer Travieso told Plaintiff that the Man and Woman did not want to press charges against Plaintiff. Pl.'s Dep. Tr. at 135:13–20. Plaintiff also heard Officer Travieso tell Officer Castillo that a female witness had told him that the Man and Woman had instigated and escalated the entire incident. *Id.* at 136:5–13.

Plaintiff was taken to Central Booking, was arraigned the next day, and was charged with violating N.Y. Penal Laws §§ 265.01(2), 240.20(2), 240.20(3), and 240.20(7)—criminal possession of a weapon in the fourth degree, and three counts of disorderly conduct. Pl.'s 56.1

St. at ¶ 63. Officer Castillo signed the criminal complaint charging Plaintiff with these crimes.[2]

Quackenbush Decl., Ex. 8. Prior to his arraignment, Plaintiff was held for approximately

twenty-two to twenty-four hours. Defs.' 56.1 St. at ¶ 24; Pl.'s 56.1 St. at ¶ 24. Following his

arraignment, Plaintiff was released on his own recognizance. Defs.' 56.1 St. at ¶ 23. At some

point afterward, Plaintiff met with the Assistant District Attorney ("ADA") assigned to prosecute

him and explained the facts of the situation concerning his arrest. Pl.'s 56.1 St. at ¶ 65. After

hearing Plaintiff's account, the ADA agreed to dismiss all charges against him and apologized

for the behavior of the arresting officers. *Id.* The criminal action was subsequently dismissed at

the first court appearance after arraignment. Defs.' 56.1 St. at ¶ 25.

### B. Commencement of the Action

Plaintiff commenced this action on November 17, 2010, and filed an amended complaint

on March 14, 2011, naming as Defendants the City of New York, Sergeant Reed, and Officers

Castillo and Travieso. Defs.' 56.1 St. at ¶ 27. Plaintiff has withdrawn his § 1983 claims for

municipal liability and denial of equal protection, as well as all of his state law claims. Pl.'s

Mem. of Law in Opp. at 24 ("Pl.'s Mem."). Thus, the only remaining claims are Plaintiff's §

1983 claims against Officer Castillo, Officer Travieso, and Sg.t Reed for false arrest, false

imprisonment, excessive force, malicious prosecution, abuse of process, supervisory liability,

and failure to intervene.

### II.  Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). "The role of the court is not to resolve disputed issues of fact but to assess

---

[2] In the criminal complaint, Officer Castillo swore under oath that Plaintiff brandished a knife with a blade of
approximately four inches and threatened to kill the Man. Quackenbush Decl. Ex. 8.

whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this Court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal citations and quotation marks omitted). No genuine issue of material fact exists "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

If the moving party satisfies this burden, the non-moving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *accord Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) ("Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment."). Importantly, if the evidence produced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted).

## III.    Discussion

### A.    False Arrest and False Imprisonment

#### 1.    Applicable Law

A § 1983 claim for false arrest sounding in the Fourth Amendment is "substantially the same" as a claim for false arrest under New York law. *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d

Cir. 2003) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Under New York law, the torts of false arrest and false imprisonment are "synonymous" and are hence analyzed as a single claim. *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991). "To establish a claim under § 1983 for false arrest a plaintiff must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Carson v. Lewis*, 35 F. Supp. 2d 250, 257 (E.D.N.Y. 1999) (Seybert, J.) (citing *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)). The existence of probable cause supporting an arrest is a complete defense to a § 1983 claim for false arrest. *Weyant*, 101 F.3d at 852; *Singer*, 63 F.3d at 118.

A police officer has probable cause to arrest when he has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. A determination of the existence of probable cause "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Maryland v. Macon*, 472 U.S. 463, 470 (1985) (internal citation omitted).

The validity of an arrest does not depend upon a finding that the arrested person is guilty. *See Pierson v. Ray*, 386 U.S. 547, 555 (1967). "Once an officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). At the same time, "an officer may not disregard plainly exculpatory evidence." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).

The existence of probable cause may be determined as a matter of law provided there is no factual dispute regarding the pertinent events and the knowledge of the officers. *See, e.g.*,

8

*Singer*, 63 F.3d at 118–19 (affirming dismissal of false arrest claim on the ground that store employees' reports of shoplifting established probable cause to arrest plaintiff). Here, the Court must determine whether a reasonable jury could believe Defendants lacked probable cause to arrest Plaintiff for criminal possession of a weapon in violation of Penal Law § 265.01(2).[3]

Under New York law, a person is guilty of criminal possession of a weapon in the fourth degree when "he possesses any dagger, dangerous knife, dirk, razor, stiletto, imitation pistol, or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another." N.Y. Penal Law § 265.01(2). A dangerous knife "connotes a knife which may be characterized as a weapon." *In re Matter of Jamie D.*, 59 N.Y.2d 589, 592 (N.Y. 1983). A dangerous instrument is "any instrument . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury. N.Y. Penal Law § 10.00(13). "Serious physical injury" is defined under New York law as a physical injury that creates "a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." *Id.* at § 10.00(10).

Where a person possesses a weapon specifically named in N.Y. Penal Law § 265.01(2) such as a dangerous knife, there is an automatic presumption of unlawful intent. *See People v. Laramore*, 764 N.Y.S.2d 299, 300 (N.Y. App. Div. 2d Dep't 2003). Mere possession of a kitchen knife, however, is not unlawful. *Id.* Because a kitchen knife is an inherently utilitarian utensil, the key inquiry is the manner in which the kitchen knife is used. *Matter of Jamie D.*, 59 N.Y.2d at 593 ("[T]he circumstances of [a kitchen knife's] possession . . . may permit a finding

---

[3] Although Plaintiff was charged with three separate counts of disorderly conduct, Defendants have not argued there was probable cause to arrest Plaintiff for any of those charges. In any event, Defendants would not succeed on such an argument because there is no evidence in the record that Plaintiff behaved "with intent to cause public inconvenience," a necessary element for any count of disorderly conduct. N.Y. Penal Law § 240.20.

that on the occasion of its possession it was essentially a weapon rather than a utensil."); *People v. Carter*, 53 N.Y.2d 113, 116 (N.Y. 1981) (holding that any item, "no matter how innocuous it may appear to be when used for its legitimate purpose, *becomes* a dangerous instrument when it is *used* in a manner which renders it readily capable of causing serious physical injury") (emphasis in original).

### 2. Plaintiff Has Raised a Triable Issue of Fact as to Whether Defendants Had Probable Cause to Arrest Plaintiff for a Violation of § 265.01(2).

In the case before us, there is no dispute that Plaintiff meant to use the paring knife as a weapon, and not as a utensil. In an attempt to defend his wife, Plaintiff pushed Ms. Levy away from the Man and Woman, held the small knife in his right hand at his side, and said, "Get away from her. If you touch my wife, you're going to get hurt." Pl.'s 56.1 St. at ¶ 43. By his actions and words, Plaintiff threatened to harm the Man and the Woman if they assaulted his wife, and his display of the paring knife clearly implied that he meant to use the knife as a weapon if necessary. Under the use-oriented analysis applied in New York, Plaintiff's use of the paring knife turned it into either a dangerous knife or a dangerous instrument, carrying with it an inference of unlawful intent. *See Matter of Jamie D.*, 59 N.Y.2d at 593; *Carter*, 53 N.Y.2d at 116.

However, Plaintiff has raised a triable issue of fact as to whether the Defendants were on notice of facts negating any unlawful intent by Plaintiff and thus eliminating probable cause to arrest Plaintiff for violation of § 265.01(2). N.Y. Penal Law § 35.15 states, "A person may . . . use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself . . . from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person." According to Plaintiff's version of the facts, which we must accept as true on a motion for summary judgment, Plaintiff clearly explained to Officer Castillo that he had grabbed the paring knife solely to defend his wife from imminent

harm. Plaintiff also placed the knife in his pocket before speaking to the police. Indeed, Plaintiff was the person who requested police assistance in the first place by calling 911. Taken together, these facts should have suggested to Defendants that Plaintiff acted out of justifiable self-defense within the terms of N.Y. Penal Law § 35.15, thus negating a finding of probable cause. Accordingly, the Court is unable to conclude as a matter of law that the Defendants had probable cause to arrest Plaintiff.

Defendants assert that the Man and the Woman told Officer Castillo and Sergeant Reed that Plaintiff became angry, pulled out a knife, and caused them to back away in fear. Were the Court to accept such facts as true, it might well conclude that Defendants had probable cause to arrest Plaintiff for violating § 265.01(2). However, Plaintiff vigorously contests whether Officer Castillo or Sergeant Reed ever spoke to the Man or Woman at all. According to Plaintiff, Officer Castillo conferred with Officer Travieso and Sergeant Reed immediately after speaking to Plaintiff. Because Plaintiff was arrested immediately after Defendants conferred, Officer Castillo could not have interviewed the Man or the Woman prior to Plaintiff's arrest. Plaintiff also claims he did not see Sergeant Reed speak to either the Man or the Woman. Although this fact does not conclusively show Sergeant Reed never spoke to the pair, it raises an ambiguity in the factual record. The Court must resolve this ambiguity in Plaintiff's favor and therefore assumes that Sergeant Reed never actually spoke to the Man or Woman. The only other information available to the Defendants prior to Plaintiff's arrest was a statement made by the Man to Officer Travieso that Plaintiff had pulled out a knife.[4] This statement lacked any indication that Plaintiff used the knife in a threatening or otherwise unlawful manner.

---

[4] While Plaintiff also did not see Officer Travieso speak to either the Man or the Woman, he admits that he did not know what Officer Travieso was doing while Plaintiff was being interviewed by Officer Castillo. Officer Travieso claims he interviewed the Man while Officer Castillo was interviewing Plaintiff. Given Plaintiff's admission, there is no actual dispute as to whether Officer Travieso spoke to the Man.

Because a reasonable jury could conclude, based on Plaintiff's version of the facts, that Defendants lacked sufficient information to overcome Plaintiff's claim of legal justification and therefore find probable cause, the Court denies Defendants' motion for summary judgment with respect to Plaintiff's false arrest and false imprisonment claims.

### 3. Defendants Lacked Probable Cause to Arrest Plaintiff for a Violation of § 240.26(3), and Plaintiff Has Raised a Triable Issue of Fact as to Whether Defendants Had Probable Cause to Arrest Plaintiff for a Violation of § 120.15.

Alternatively, Defendants argue that they had probable cause to arrest Plaintiff for harassment and menacing. Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 6–7.

"A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person . . . [h]e or she engages in a *course of conduct or repeatedly* commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose." N.Y. Penal Law § 240.26(3) (emphasis added). New York courts have held that a single isolated incident is insufficient to support a finding of a course of conduct within the meaning of § 240.26(3). *People v. Wood*, 464 N.Y.S.2d 738, 738 (N.Y. 1983); *Ebony J. v. Clarence D.*, 46 A.D.3d 309, 847 N.Y.S.2d 523, 524 (N.Y. App. Div. 1st Dep't 2007). Because the events underlying Plaintiff's arrest constituted a single isolated incident, the Court concludes that Defendants lacked probable cause to believe Plaintiff had committed the crime of harassment in the second degree.

In New York, "[a] person is guilty of menacing in the third degree when, by physical menace, he or she intentionally places or attempts to place another person in fear of death, imminent serious physical injury or physical injury." N.Y. Penal Law § 120.15. "The defendant must take a physical action with the intent to make another reasonably afraid of an imminent

danger; that is, the perceived danger must be immediate." *Ackerson v. City of White Plains*, 702

F.3d 15, 20 (2d Cir. 2012) (emphasis omitted). Accepting Plaintiff's version of events, the Court

concludes there is a genuine dispute as to whether the Defendants were on notice of sufficient

facts to believe Plaintiff had committed the crime of menacing in the third degree. The Man's

statement to Officer Travieso that Plaintiff had pulled out a knife did not give any indication the

Man feared for his personal safety. Furthermore, Plaintiff issued a conditional threat, warning

the Man and Woman they would be hurt if they touched Ms. Levy. Thus, even if the Man or

Woman feared for their safety, under Plaintiff's account, they did not fear "imminent physical

injury" within the meaning of Penal Law § 120.15. *Holley v. County of Orange, New York*, 625

F. Supp. 2d 131, 139 (S.D.N.Y. 2009) (Eginton, J.). Accordingly, the Plaintiff has raised a

triable issue of material fact as to whether the Defendants had probable cause to arrest Plaintiff

for violation of Penal Law § 120.15. As such, the Court denies Defendants' motion for summary

judgment with respect to Plaintiff's false arrest and false imprisonment claims to the extent the

motion argues there was probable cause to arrest Plaintiff for menacing in the third degree.

### B. Malicious Prosecution

#### 1. Applicable Law

In New York, a claim for malicious prosecution brought under 42 U.S.C. § 1983 has four

elements: (1) the initiation of a proceeding, (2) termination of said proceeding favorable to

plaintiff, (3) lack of probable cause, and (4) malice. *Savino v. City of New York*, 331 F.3d 63, 72

(2d Cir. 2003) (quoting *Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y. 1983)). In

addition, a plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983

must show "some deprivation of liberty consistent with the concept of 'seizure.'" *Singer*, 63

F.3d at 116.

In general, "[o]nce a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening actions of the prosecutor, thereby abolishing the officer's responsibility for the prosecution." *Douglas v. City of New York*, 595 F. Supp. 2d 333, 342 (S.D.N.Y. 2009) (Chin, J.) (citations omitted). In other words, a plaintiff usually cannot show arresting officers initiated a criminal proceeding against him solely based on an arrest. However, where a police officer is accused of providing false information to a prosecutor that "influences a decision whether to prosecute, he may be held liable for malicious prosecution." *Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999) (Rakoff, J.).

For purposes of establishing the second element of a malicious prosecution claim, where there is no judicial determination of the criminal proceeding on the merits, "whether a voluntary dismissal [of criminal charges] is indicative of innocence requires a careful examination of the record." *Chimurenga*, 45 F. Supp. 2d at 343. If the factual record "raises a reasonable possibility that the dismissal was for lack of evidence, *i.e.*, favorable to the plaintiff," summary judgment is not appropriate on the issue of whether termination of the criminal proceeding was favorable to the plaintiff. *Id.* As to the malice element, the Second Circuit has held that "lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment." *Ricciuti*, 124 F.3d at 131.

Lastly, the Second Circuit has held that in New York, when a criminal defendant is released on his own recognizance, he must "render himself at all times amenable to the orders and processes of the court and therefore must ordinarily remain in the state." *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 216 (2d Cir. 2000) (citing N.Y. Crim. P. Law § 510.40)

(internal quotation marks omitted). Such limitations on an individual's liberty are sufficient to implicate a Fourth Amendment seizure for purposes of a malicious prosecution claim. *Id.*

### 2. Plaintiff Has Raised Triable Issues of Fact as to Whether Defendants Maliciously Prosecuted Plaintiff

Defendants argue they are entitled to summary judgment on Plaintiff's malicious prosecution claim because Defendants had probable cause to arrest Plaintiff and Plaintiff did not suffer a post-arraignment deprivation of liberty sufficient to implicate the Fourth Amendment. Defs.' Mem. at 7–9. The Court has already concluded there is a genuine dispute as to whether Defendants had probable cause to arrest Plaintiff for any crime. Moreover, the parties do not dispute that Plaintiff was released on his own recognizance following his arraignment. This fact alone raises a triable issue as to whether Plaintiff suffered a post-arraignment deprivation of liberty. *See Davis v. City of New York*, 373 F. Supp. 2d 322, 336 (S.D.N.Y. 2005) (Lynch, J.) (plaintiffs' release on their own recognizance the day after their arrest was "enough to create an issue of fact as to whether plaintiffs suffered sufficient liberty restraints to violate the Fourth Amendment and thereby carry plaintiffs' § 1983 malicious prosecution claim").

Although the parties have not briefed the remaining elements of Plaintiff's malicious prosecution claim, the Court finds there are genuine disputes of material fact as to all of those elements. As to the first element, a reasonable jury could find Defendants initiated a criminal proceeding against Plaintiff. As noted earlier, Plaintiff disputes whether Officer Travieso or Sergeant Reed every spoke to the Man or Woman, and Defendants largely rely on these purported witness statements to show probable cause. In essence, Plaintiff has accused Defendants of providing false information to the prosecutor, and when such false information "influences a decision whether to prosecute, [the officers] may be held liable for malicious prosecution." *Chimurenga*, 45 F. Supp. 2d at 343. Under these circumstances, there is at least a

triable issue as to whether Defendants initiated a criminal proceeding against Plaintiff for purposes of the malicious prosecution claim. *See id.*

Likewise, a reasonable jury could find that the voluntary dismissal of Plaintiff's criminal charges represented a favorable termination indicative of Plaintiff's innocence. The dismissal of Plaintiff's criminal charges does not indicate the grounds for such dismissal. Quackenbush Decl., Ex. 10. However, according to Plaintiff, after he explained the facts of the situation concerning the Man and Woman to the ADA, the ADA agreed to dismiss all charges and even apologized for the behavior of Defendants. On these facts, a reasonable jury could find the dismissal was based on Plaintiff's innocence.

The Court has already found a reasonable jury could find the Defendants lacked probable cause to arrest Plaintiff. Because "lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment," there is a triable issue as to whether Defendants acted with malice in arresting Plaintiff and initiating a criminal proceeding against him. *See Ricciuiti*, 124 F.3d at 131.

Because triable issues of fact exist as to every element of the malicious prosecution claim, summary judgment is inappropriate on Plaintiff's malicious prosecution claim.

## C. Qualified Immunity

### 1. Applicable Law

Defendants claim they are entitled to qualified immunity as to Plaintiff's false arrest and malicious prosecution claims. "[A]n arresting officer is entitled to qualified immunity on claims of false arrest and malicious prosecution if either: (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Carthew v. County of Suffolk*, 709 F.

Supp. 2d 188, 203 (E.D.N.Y. 2010) (Bianco, J.) (citing *Walczyk v. Rio*, 496 F.3d 139, 163 (2d

Cir. 2007); *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 416 (2d Cir. 1999)).

The Second Circuit has defined the latter standard, whether officers of reasonable

competence could disagree on whether probable cause existed (often known as "arguable

probable cause"), as follows:

> Arguable probable cause exists when a reasonable police officer in the same
> circumstances and possessing the same knowledge as the officer in question *could*
> have reasonably believed that probable cause existed in the light of well
> established law. It is inevitable that law enforcement officials will in some cases
> reasonably but mistakenly conclude that probable cause is present, and we have
> indicated that in such cases those officials—like other officials who act in ways
> they reasonably believe to be lawful—should not be held personally liable.

*Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (quotation marks and internal citations

omitted) (emphasis in original). Moreover, under this standard, "an 'arresting officer is entitled

to qualified immunity as a matter of law if the *undisputed facts* and all permissible inferences

favorable to the plaintiff show . . . that officers of reasonable competence could disagree on

whether the probable cause test was met.'" *McClellan v. Smith*, 439 F.3d 137, 147–48 (2d Cir.

2006) (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)) (internal editing omitted).

In establishing whether arguable probable cause existed, officers are "entitled to draw

reasonable inferences from the facts they possess at the time of a seizure based upon their own

experiences." *Cerrone*, 246 F.3d at 203 (citing *Ornelas v. United States*, 517 U.S. 690, 699

(1996)). "This forgiving standard protects 'all but the plainly incompetent or those who

knowingly violate the law.'" *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001)

(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Only where an officer's judgment was "so

flawed that no reasonable officer would have made a similar choice," is the denial of qualified

immunity appropriate. *Id.* In the end, qualified immunity "protects government officials when

they make 'reasonable mistakes' about the legality of their actions." *Doninger v. Niehoff*, 642 F.3d 334, 353 (2d Cir. 2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

### 2. Defendants Are Entitled to Qualified Immunity as to Plaintiff's False Arrest and Malicious Prosecution Claims

The Court finds that Defendants had arguable probable cause to arrest Plaintiff and thus are entitled to qualified immunity as to Plaintiff's false arrest and malicious prosecution claims. Even construing all factual disputes and ambiguities in Plaintiff's favor, reasonably competent police officers equipped with the same facts before Defendants could have reasonably believed there was probable cause to arrest Plaintiff. Upon arriving at the scene, Plaintiff told Officers Castillo and Travieso that he had a knife on his person, a fact that would lead any reasonably competent police officer to become concerned. Moreover, it is undisputed that Defendants knew that Plaintiff had grabbed the knife in the context of a heated argument with the Man and the Woman. Finally, while holding the knife in his hand, Plaintiff threatened the Man and Woman that he would hurt them if they touched his wife. Under these circumstances, notwithstanding Plaintiff's claims of justifiable self-defense, reasonable police officers in Defendants' position could have concluded that Plaintiff had committed some wrongdoing. Although the Defendants' conclusion was mistaken, the doctrine of qualified immunity protects government officials from facing liability due to "reasonable mistakes." *Doninger*, 642 F.3d at 353. In this regard, Defendants were not "plainly incompetent." *Provost*, 262 F.3d at 160. Accordingly, Defendants are entitled to qualified immunity as to Plaintiff's false arrest and malicious prosecution claims, and the Court dismisses those claims with prejudice.

### D. Abuse of Process

#### 1. Applicable Law

In New York, an abuse of process claim brought under 42 U.S.C. § 1983 has three elements: (1) the defendant employs regularly issued legal process to compel performance or forbearance of some act; (2) with intent to do harm without excuse or justification; and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process. *Savino*, 331 F.3d at 76. For purposes of the "collateral objective" element, the Second Circuit expressly distinguishes between a "malicious motive" and an "improper purpose"; only the latter constitutes a collateral objective sufficient to constitute the third element of an abuse of process claim. *Hoffman v. Town of Southampton*, 11-cv-3690, 2012 WL 4465779, at *9 (E.D.N.Y. Sept. 28, 2012) (Bianco, J.) (citing *Savino*, 331 F.3d at 77). To state a claim for abuse of criminal process, a plaintiff must claim the defendant "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77. It is not enough to allege a malicious motive such as retaliation. *Id.* Examples of the types of collateral objectives that satisfy the third element include infliction of economic harm, extortion, blackmail and retribution. *Brandon v. City of New York*, 705 F. Supp. 2d 261, 275 (S.D.N.Y. 2010) (Preska, C.J.).

#### 2. Plaintiff Has Failed to Raise a Triable Issue of Fact as to Harmful Intent or Collateral Objective

Plaintiff has failed to produce any evidence to raise a genuine issue of material fact to support his claim that his arrest and prosecution by Defendants were based on an intent to do harm or in order to obtain an impermissible collateral objective. Plaintiff argues that Defendants are liable for abuse of process because Officer Castillo criticized Plaintiff's behavior as being beneath the "higher standard" she expected of teachers. Pl.'s Mem. at 20. According to

Plaintiff, this remark revealed that Officer Castillo "obviously believed someone like [Plaintiff] should not be allowed to be a teacher, and any reasonable person knows that initiating criminal process against a public school teacher puts that teacher's career in grave jeopardy." *Id.* In other words, Plaintiff argues that Officer Castillo abused the criminal process to achieve the impermissible collateral objective of having Plaintiff fired from his job as a teacher.

No reasonable jury could conclude, on the basis of Officer Castillo's remark alone, that any of the Defendants intended to do Plaintiff collateral harm by arresting and prosecuting him, thereby causing him to lose his job as a teacher. While a jury could reasonably infer from Officer Castillo's lone comment that she disapproved of Plaintiff's behavior, no reasonable jury could infer solely from the comment that the Defendants had a malicious intent or intended to have Plaintiff lose his job due to the arrest. Because the evidence offered by Plaintiff "is merely colorable, [and] is not significantly probative [of the elements of an abuse of process claim], summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

Because Plaintiff has failed to raise a triable issue of material fact as to his claim for abuse of process, that claim is dismissed with prejudice.

### E. Supervisory Liability

#### 1. Applicable Law

In addition to claiming Sgt. Reed is directly liable under 42 U.S.C. § 1983 for false arrest, Plaintiff asserts Sgt. Reed is liable under § 1983 on a theory of supervisory liability. Pl.'s Mem. at 23. Courts in the Second Circuit apply the supervisory liability test set forth in *Colon v. Coughlin*, which provides five ways in which a supervisory defendant may be shown to have had "personal involvement" in a subordinate's primary constitutional tort: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being

informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." 58 F.3d 865, 873 (2d Cir. 1995).

However, in *Ashcroft v. Iqbal*, the Supreme Court limited the scope of claims for supervisory liability under § 1983, rejecting the notion that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." 556 U.S. 662, 677 (2009). Instead, a supervisory official can only be held liable for "his or her own misconduct." *Id.* Plaintiff seeks to recover from Sgt. Reed under a theory of supervisory liability arising from his order to Officers Castillo and Travieso to arrest Plaintiff. As such, Plaintiff alleges Sgt. Reed personally participated in a constitutional tort, satisfying the requirements of supervisory liability under *Iqbal.* Pl.'s Mem. at 23.

### 2. Sergeant Reed is Entitled to Qualified Immunity

The Court concludes Sgt. Reed is entitled to qualified immunity on Plaintiff's supervisory liability claim for substantially the same reasons he is entitled to qualified immunity on the false arrest and malicious prosecution claims. Indeed, Plaintiff predicates the false arrest, malicious prosecution, and supervisory liability claims against Sgt. Reed on the same factual nexus: "Sgt. Reed is being sued because he personally ordered his subordinate officers to arrest [Plaintiff]." *Id.* at 23. Although Sgt. Reed's order was based on a mistaken conclusion that probable cause existed, that mistake was reasonable under the circumstances because Sgt. Reed learned from Officers Castillo and Travieso that Plaintiff: (1) had a knife on his person; and (2)

had grabbed the knife during a heated argument. Therefore, the Court dismisses Plaintiff's supervisory liability claim with prejudice.

### F. Excessive Force

#### 1. Applicable Law

Although Plaintiff has not explicitly pled a claim of excessive force against any of the Defendants under 42 U.S.C. § 1983, the pleadings as a whole clearly seek to assert an excessive force claim. Indeed, Plaintiff's claim for failure to intervene is based on failure to stop Officer Travieso's alleged use of excessive force, necessarily implying an excessive force claim. Am. Compl. at ¶ 79–84. Therefore, the Court will construe the amended complaint liberally and treat it as having pled a claim of excessive force against Defendant Officer Travieso.

In the context of arrests, claims that police officers have used excessive force "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). In this case, the Court must determine whether the facts, viewed in the light most favorable to Plaintiff, demonstrate that the use of force was not objectively reasonable. *Washpon v. Parr*, 561 F. Supp. 2d 394, 406 (S.D.N.Y. 2008) (Buchwald, J.) (citing *Cowan v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003)).

To succeed on an excessive force claim, a plaintiff must also present sufficient evidence to establish that "the alleged use of force is 'objectively sufficiently serious or harmful enough' to be actionable." *Cunningham v. Rodriguez*, 01-cv-1123, 2002 WL 31654960, at *4 (S.D.N.Y. Nov. 22, 2002) (Chin, J.). "[T]he Second Circuit and district courts in the Circuit recognize the concept of 'de minimis' injury and, when the injury resulting from alleged excessive force falls into that category, the excessive force claim is dismissed." *Lemmo v. McKoy*, 08-cv-4264, 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011) (Dearie, J.). "Injuries held to be de minimis for

purposes of defeating excessive force claims include short-term pain, swelling, and bruising, brief numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, and two superficial scratches from a cut inside the mouth." *Id.* (citations omitted).

"Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005) (Sifton, J.) In evaluating the reasonableness of handcuffing, the Court must consider the following evidence: (1) whether the handcuffs were unreasonably tight; (2) whether the Defendants ignored the Plaintiff's pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists. *Id.* at 215.

### 2. Plaintiff Has Raised a Triable Issue of Fact as to Whether Officer Travieso Used Excessive Force

Applying this standard to the case at hand, the Court finds there are triable issues of fact as to the objective reasonableness of Officer Travieso's handcuffing of Plaintiff. There is uncontested evidence that the first two elements are met. Plaintiff testified that after Officer Travieso handcuffed Plaintiff, Plaintiff immediately complained that the handcuffs were too tight. Pl.'s Dep. Tr. at 128:19–25. Officer Travieso ignored the complaint, and the handcuffs were not loosened until Plaintiff arrived at the police station. *Id.* at 128:23–129:3, 156:15–18. As to the third element, Plaintiff testified that the cuff on his right hand was "directly on the bone where the wrist is," causing him to suffer a "very deep gouge" that took about one month to heal. *Id.* at 129:1–7; 151:8–12. In addition, the handcuffs aggravated preexisting issues with Plaintiff's wrist. *Id.* at 151:23–152:7. The Second Circuit has "permitted [excessive force] claims to survive summary judgment where the only injury alleged is bruising." *Hayes v. New York City Police Dep't*, 212 F. App'x 60, 62 (2d Cir. 2007). Plaintiff's alleged injuries go beyond mere bruising. A rational jury could find that the "very deep gouge" that took about one

month to heal, as well as the aggravation of preexisting wrist issues, were sufficiently severe to be cognizable injuries under 42 U.S.C. § 1983.

### G. Failure to Intervene

#### 1. Applicable Law

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). An officer who fails to intervene is liable for the preventable harm caused by other officers where that officer observes or has reason to know that other officers have committed a constitutional violation, including use of excessive force and/or unjustifiable arrest. *Id.* In addition, the officer must have had a realistic opportunity to intervene to prevent the harm from occurring. *Id.* Finally, "the failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim." *Matthews v. City of New York*, 10-cv-4991, 2012 WL 3839505, at *19 (E.D.N.Y. Sept. 5, 2012) (Matsumoto, J.).

#### 2. Plaintiff Has Raised a Triable Issue of Fact as to Plaintiff's Failure to Intervene Claim

Plaintiff asserts that Defendants failed to intervene and prevent two separate constitutional violations: false arrest and excessive force. Pl.'s Mem. at 21. The Court has already concluded that the predicate claim for false arrest cannot survive due to qualified immunity. Therefore, the claim for failure to intervene based on the false arrest claim likewise fails.

The Court concludes that there are genuine disputes of material fact as to Plaintiff's claim that Officer Castillo failed to intervene and prevent Officer Travieso's use of potentially excessive force. Plaintiff testified that after he was handcuffed, Officer Castillo led Plaintiff to

the police van. Pl.'s Dep. Tr. at 129:12–13. At that time, Plaintiff told Officer Castillo that the handcuffs were too tight, but she did nothing in response. *Id.* at 129:14–21. Based on this evidence, a reasonable jury could find that Officer Castillo was aware that Officer Travieso had used excessive force, and that Officer Castillo could have intervened by loosening the cuffs.

In contrast, no reasonable jury could find that Sgt. Reed was on notice of Officer Travieso's use of potentially excessive force because Plaintiff never complained to Sgt. Reed. Sgt. Reed was present when Plaintiff arrived at the police station and came before the desk sergeant, at which time Plaintiff was still in handcuffs. *Id.* at 154:16 – 156:10. The record shows that Plaintiff did not complain of the tightness of the handcuffs at this time, and his handcuffs were removed soon thereafter. *Id.* at 156:11–18. Consequently, the Court grants Defendants' motion for summary judgment as to Plaintiff's claim for failure to intervene and prevent excessive force as to Sgt. Reed, but denies the motion as to Officer Castillo.

## IV.    Conclusion

Defendants' motion for summary judgment is granted with respect to Plaintiff's false arrest, false imprisonment, malicious prosecution, and supervisory claims due to qualified immunity. The Court grants Defendants' motion for summary judgment as to Plaintiff's abuse of process claim on its merits. The Court denies Defendants' motion for summary judgment as to Plaintiff's claims that Officer Travieso used excessive force in handcuffing Plaintiff and that Officer Castillo failed to intervene to prevent use of said excessive force.

## SO ORDERED

Dated:    Brooklyn, New York
          March 29, 2013                              s/WFK

                                      _____
                                      HON. WILLIAM F. KUNTZ, II
                                      United States District Judge

25